United States District Court
Southern District of Texas
**ENTERED**
January 04, 2022
Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| VITA INTERNATIONAL, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:18-CV-01663 |
| | § | |
| FORO ENERGY, INC., *et al.*, | § | |
| | § | |
| Defendants. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Vita International, Inc. has brought trade secret misappropriation and breach of contract claims against Defendant Foro Energy, Inc. The Court held a four-day bench trial on these claims beginning on August 10, 2021. The Court now submits the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a)(1) of the Federal Rule of Civil Procedure.

### I.     LEGAL STANDARD

Rule 52(a)(1) of the Federal Rules of Civil Procedure provides that, "[i]n an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions . . . may appear in an opinion or a memorandum of decision filed by the court." Fed. R. Civ. P. 52(a)(1). In articulating findings of fact, Rule 52(a) "exacts neither punctilious detail nor slavish tracing of the claims issue by issue and witness by witness." *Cent. Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998) (quoting *Burma Navigation Corp. v. Reliant Seahorse M/V*, 99 F.3d 652, 656 (5th Cir. 1996)). Instead, the rule is satisfied where the findings present the reviewer with "a clear understanding of the basis for the decision." *Id.* In accordance with Rule 52(a), this Memorandum and Opinion first

lays out the Court's findings of fact followed by its conclusions of law.[1]

## II.    FINDINGS OF FACT

### A. Procedural History

1. On May 22, 2018, Vita filed suit against Foro, alleging misappropriation of trade secrets under the Texas Uniform Trade Secrets Act (TUTSA), Tex. Civ. Prac. & Rem. Code §§ 134A.001 et. seq.[2] Doc. 1.

2. Vita filed its Fourth Amended Complaint (Doc. 42) on September 3, 2019. That operative pleading asserted a TUTSA claim, a claim under the Defend Trade Secrets Act ("DTSA"), and a breach of contract claim as to the Nondisclosure and Restricted Use Agreement (the "NDA") executed by the parties in July 2014. Doc. 42 at ¶¶ 39- 45; PX001.

3. The parties consented to a bench trial, which spanned from August 10, 2021 through August 13, 2021.

### B. The Parties

4. Vita is a Texas Corporation with its principal place of business in Harris County, Texas. Doc. 1. Vita was founded in 1988 in Houston, Texas by Khaled Shaaban, the company's current President and CEO. Trial Tr. 47:23-25, Aug. 11, 2021 (Shabaan). Vita manufactures various types of equipment for use in various sectors of the energy industry, including upstream, midstream and downstream. Doc. 42 at ¶ 4; Trial Tr. 48:18- 49:6, Aug. 11, 2021 (Shaaban).

---

[1] To the extent any Finding of Fact reflects a legal conclusion, it shall to that extent be deemed a Conclusion of Law; and to the extent any Conclusion of Law reflects a factual finding, it shall to that extent be deemed a Finding of Fact.

[2] Vita's original complaint also asserted these claims against DECK Engineering, OU ("DECK"), among others. Doc. 1. Vita's claims against DECK were dismissed with prejudice on September 3, 2019. Doc. 43. Foro is the only remaining Defendant.

5. Foro Energy, Inc. ("Foro") is a Delaware Corporation with its principal place of business in Harris County, Texas. Doc 1. Foro is in the business of commercializing the application of high-powered lasers for the oil, natural gas, geothermal, and mining industries. Trial Tr. 236:22-237:1, Aug. 10, 2021 (Deutch). Paul Deutch is Foro's CEO.

6. In 2020, Foro made $6.5 million in commercial revenue. Trial Tr. 12:7-13, Aug. 11, 2021 (Deutch). However, it lost $5 million in 2020; from 2016 to 2020, it lost more over $12 million specifically from offshore decommissioning work. *Id.* at 12:14-13:9.

### C. FORO's Venture into Offshore Decommissioning

7. Relevant here is Foro's use of its technology in the offshore decommissioning context. Foro hoped to commercialize the use of its high-powered laser technology to cut casing on offshore oil and gas platforms as part of the decommissioning process.[3] Trial Tr. 10:22-12:6, Aug. 11, 2021 (Deutch).

8. To utilize its high-powered laser technology as part of offshore decommissioning operations, Foro marketed its laser as a "Multiconductor Cutting Tool," or the "MaCC." Trial Tr. 84:23-85:2, Aug. 12, 2021 (Marshall). The MaCC is deployed into an offshore wellbore to sever casings at the sea floor level. Trial Tr. 237:5-16, Aug. 10, 2021 (Deutch). After the cut is performed, the MaCC returns to the platform and Foro's portion of that decommissioning operation is complete. *Id.*

9. Foro considers its laser technology proprietary and a primary driver of potential value for the company. Trial Tr. 9:15-24, Aug. 11, 2021 (Deutch). On the other hand, the ancillary

---

[3] Decommissioning involves the removal of an onshore or offshore well after it has been plugged. Trial Tr. 237:17-25, Aug. 10, 2021 (Deutch). Foro's technology has been used to cut casing, as one step in the multi-step decommissioning operation. Trial Tr. 17:3-17, Aug. 11, 2021 (Deutch).

equipment associated with deploying the laser is commoditized and can be rented, outsourced, or purchased by Foro for use by its customers. *Id.* at 15:13-17 (Deutch).

**D. Deploying the MaCC**

10. There is a variety of ways to deploy tools like the MaCC into a wellbore. Trial Tr. 49:12-21, Aug. 11, 2021 (Edwards); Trial Tr. 210:11-23, Aug. 12, 2021 (Newman) ("there are a number of different ways" Foro could have deployed its laser, "and many of them have existed for a long time").

11. One common way to do so is with "coiled tubing," or "CT," which is thin-wall pipe that can be used to get tools into a wellbore. Trial Tr. 82:22-83:11, Aug. 10, 2021 (Byrd); *see* Trial Tr. 53:5-17, Aug. 11, 2021 (Shaaban).

12. The MaCC, however, is deployed using an "umbilical." In this context, an umbilical is "a four-inch diameter plastic pipe from the outside" that can hold "conduits, circular pipe, [] electrical cables, [or] fiber optic cables" and is deployed into a wellbore. Trial Tr. 8:17-9:6, Aug. 11, 2021 (Deutch). The umbilical facilitates supplying the MaCC with enough electrical power and air to support the laser during downhole operations. Trial Tr. 14:1:16, Aug. 12, 2021 (Marshall).

13. This case involves the "injector" mechanism used to guide the umbilical directly into the wellbore. Trial Tr. 112:10-15, Aug. 10, 2021 (Byrd); Trial Tr. 29:11-30:1, Aug. 11, 2021 (Deutch). An injector allows horizontal unspooling of the umbilical, which can then be routed on the injector at a 90-degree angle and vertically guided in and out of the wellbore. Trial Tr. 20:1-11, Aug. 11, 2021 (Deutch). The type of injector at issue here is referred to

as an "injector wheel" or "deployment wheel" because the base of the design for the injector is a sheave wheel.[4]

14. Other devices, however, can accomplish the task of turning an umbilical 90 degrees and guiding it into a wellbore. *Id.* at 20:12-20; Trial Tr. 149:24-150:4, Aug. 12, 2021 (Marshall). This relatively simple task does not require a sophisticated piece of equipment. Trial Tr. 29:11-30:1, Aug. 11, 2021 (Deutch). Examples include a crane, which Foro uses when deploying the MaCC onshore; a non-powered wheel; a hydraulically powered wheel; a gooseneck; or a dual-chain injector. *Id.*; Trial Tr. 121:7-16, Aug. 11, 2021 (Shaaban).

15. Foro outsources the injector mechanism for the MaCC. Trial Tr. 148:24-149:23, Aug. 12, 2021 (Marshall).

16. When Foro began to use its MaCC tool in (onshore) decommissioning operations, it procured an "injector sheave" to guide the umbilical and deploy the MaCC tool. Trial Tr. 20:21-25, Aug. 11, 2021 (Deutch). Foro purchased this injector sheave from a company called Power Hydraulics for $125,000 (the "Power Hydraulics sheave"). *Id.* at 21:1-8; DX036. The Power Hydraulics sheave is 72 inches in diameter, hydraulically operated and could be adapted for different types of casing and for onshore/offshore use. *Id.* at 21:9-25. It also allowed for "side-loading," meaning that the umbilical could be engaged and loaded onto the sheave from the side. *Id.* This feature allowed Foro to attach the laser tool to the umbilical in advance and engage the sheave with the tool attached. Trial Tr. 79:1-16, Aug.

---

[4] During trial, the parties did not dispute that the terms "deployment wheel," "wheel injector," and "injector wheel" are used interchangeably to refer to the same piece of equipment. Trial Tr. 112:10-15, Aug. 10, 2021 (Byrd). Here, the Court generally uses the term "deployment wheel" to refer to the equipment at issue.

10, 2021 (Byrd). Foro successfully deployed the MaCC using the Power Hydraulics sheave on numerous occasions. *Id.* at 21:7-8.

17. In mid-2013, Foro began outlining a plan to use the MaCC offshore. Trial Tr. 22:1- 17, Aug. 11, 2021 (Deutch). Foro initially contemplated using the MaCC in the Gulf of Mexico, but eventually determined that it would pursue decommissioning opportunities in the North Sea. Trial Tr. 76:12-20, Aug. 12, 20221 (Marshall). Accordingly, the MaCC spread of equipment had to be certified for use in the North Sea (DNV) and Norway (NORSOK). The requirements for DNV and NORSOK certifications are more difficult to meet than those for certification of use in Gulf of Mexico. Trial Tr. 48:16-22, Aug. 12, 2021 (Edwards).

18. Foro procured a non-powered sheave wheel that could deploy the MaCC offshore, DX082; Trial Tr. 196:16-197:5, Aug. 12, 2021 (Newman), though the Power Hydraulics sheave could also have been modified for offshore use pursuant to North Sea specifications. Trial Tr. 22:1-17, Aug. 11, 2021 (Deutch); DX036.

19. Foro then began considering an upgrade to the MaCC's deployment wheel. *Id.*; Trial Tr. 196:25-197:5, Aug. 12, 2021 (Newman) ("Q. [I]s it your opinion that Foro needed to have an upgrade to this to run their laser, or they just wanted to have an upgrade to run their laser? A. They wanted to. They didn't need it."). Foro reached out to third-party vendors to evaluate the feasibility of an upgrade. *Id.* As is common industry practice, Foro usually evaluates multiple vendors before selecting one. Trial Tr. 23:20- 24:17, Aug. 12, 2021 (Edwards).

20. Foro first reached out to "market leaders" in the design and manufacturing of coiled tubing equipment, such as NOV and Stewart & Stevenson. Trial Tr. 73:10-18, Aug. 12, 2021

(Marshall); *see also* Trial Tr. 61:4-1, Aug. 11, 2021 (Shaaban) (acknowledging that NOV and Stewart & Stevenson could build the type of injector Foro was seeking). Foro also reached out to smaller third-party vendors like Vita.

**E. Vita's Business**

21. Vita is a smaller manufacturer than those it considers its main competitors: NOV and Stewart & Stevenson. Trial Tr. 115:15-24, Aug. 11, 2021 (Shaaban). Vita's work spans across various areas. *Id.* at 48:18-49:6 (Vita works with coiled tubing, nitrogen, CO2 equipment, LNG equipment, and heat-transfer equipment). Vita currently has about 10 employees, but has been as high as "49, 48 people at some points." Trial Tr. 52:21-53:4, Aug. 11, 2021 (Shaaban).

22. Vita began its business doing training operations and engineering work, and in 1995 Vita opened its manufacturing business in Houston, TX. *Id.* at 49:14-24. Over time, Vita has shifted its focus to the manufacturing side of its business because of the higher margins and greater opportunity to recover costs. *See id.* at 75:23-77:9 (Shaaban) (noting that manufacturing has higher margins, and that Vita writes off design and engineering costs to ensure it gets to the manufacturing stage).

23. Vita identified a potential business opportunity to sell circular, or wheel-type injectors for coiled tubing in 1995. *Id.* at 53:18-54:11. Vita subsequently acquired a license to a patent for the "circular, or wheel-type injector" from a company called Fleet Cementers. *Id.*at 54:12-21. Fleet Cementers was run by Thomas Gipson, who was the original designer of this style of equipment and held the original patent on an "apparatus for injecting tubing into a well," issued on June 16, 1987 (the "1987 Patent"). Trial Tr. 193:1-8, Aug. 12, 2021 (Newman); DX010. To license this patent, Vita agreed to pay Fleet Cementers $10,000 per

wheel that Vita manufactured and sold. Trial Tr. 121:17-122:1, Aug. 11, 2021 (Shaaban); DX039. Vita's technical expert, Dr. Robert Byrd, agreed that $10,000 per wheel was a reasonable fee. Trial Tr. 140:3-13, Aug. 11, 2021 (Byrd).

24. In 1996 Vita manufactured its first coiled tubing unit prototype. Trial Tr. 56:24- 57:9, Aug. 11, 2021 (Shaaban). It included a spread of equipment: an injector wheel, a reel, a truck, and mast arms. DX012 (the 1998 Patent); DX037; DX038. Vita eventually sold this prototype to Gipson for $350,000 as "part of [a] settlement with Fleet [Cementers]." Trial Tr. 142:2-25, Aug. 11, 2021 (Shaaban); DX040.

25. Vita patented the prototype's concept in 1998 (the "1998 Patent"). The 1998 Patent shows 14 "hold down rollers" and describes having the hold down rollers detach from the injector device and pivot 90 degrees upwards. DX012.008; Trial Tr. 203:12-22, Aug. 12, 2021 (Newman) (explaining that by removing a pin on one side of the hold down roller, it can pivot 90 degrees); Trial Tr. 146:3-147:22, Aug. 10, 2021 (Byrd). Notably, this design also allows for coiled tubing or an umbilical to be side loaded onto the injector device. Trial Tr. 204:18-205:17, Aug. 12, 2021 (Newman) ("Q. Okay. So would this allow for side-loading … this coil[ed] tubing injector? A. Yes."). Vita failed to pay its maintenance fees on the patent, and it expired in 2006. Trial Tr. 119:1-7, Aug. 11, 2021 (Shaaban).

26. Vita stopped pursuing coiled tubing in 1997 but "commenced again sometime around 2001." Trial Tr. 57:10-18, Aug. 11, 2021 (Shaaban). In 2001, Vita constructed a second coiled tubing unit prototype, which was eventually sold for $450,000. Trial Tr. 188:6-18, Aug. 11, 2021 (Lynn). Shaaban testified that Vita "certainly lost money on the first two prototypes." Trial Tr. 120:5-10, Aug. 11, 2021 (Shaaban).

27. In the past 25 years, Vita has manufactured a total of four coiled tubing units—two prototypes to start, and two production units after that. Trial Tr. 58:8-12, Aug. 11, 2021 (Shaaban); *id.* at 119:24-120:4. Vita against stopped pursuing coiled tubing injectors "sometime in 2002." Trial Tr. 57:10-18, Aug. 11, 2021 (Shaaban).

28. Shabaan is not an engineer. Trial Tr. 50:21-23, Aug. 11, 2021 (Shaaban). Vita no longer employs the engineers and designers who worked on its coiled tubing units and the 1998 Patent, aside from Shaaban and Wally McClanahan. *But see* Trial Tr. 118:19-119:3, Aug. 11, 2021 (Shaaban) (noting that although McClanahan was still with Vita in 2014 and 2015, he did not work on the Foro project because he was "[b]usy with other things").

### F.  Foro's Initial Contact with Vita

29. On April 12, 2013, Ron De Witt, a Foro employee, reached out to Vita through the generic contact form on Vita's website to inquire about coiled tubing deployment wheels. Trial Tr. 55:21-56:4, Aug. 12, 2021 (Marshall); DX057. Vita and Foro connected shortly after initial contact, but once Vita informed Foro that it did not have one of its coiled tubing units for sale, discussions stopped. Trial Tr. 63:6-16, Aug. 11, 2021 (Shaaban).

30. Roughly one year later, in May 2014, Foro reached back out to Vita to discuss building a deployment wheel for the MaCC. Trial Tr. 64:5-20, Aug. 11, 2021 (Shaaban); DX058. Foro provided further detail on the type of wheel it was looking for, explaining that this new wheel would likely be used in the Gulf of Mexico. Trial Tr. 56:19-57:16, Aug. 12, 2021 (Marshall). Foro specifically requested a wheel-style injector, outlined the estimated max pull weight the wheel should have, and noted that the unit would be used on an

offshore platform and thus needed to sit on a skid.[5] DX059. Foro also informed Vita that it

had previously used other means to deploy the MaCC. *Id.* at DX059.001.

31. On July 7, 2014, Vita proposed undertaking a "feasibility study" to assess whether it could

build the deployment wheel and, if so, how long and how much it would cost to build. Trial

Tr. 254:20-255:4, Aug. 10, 2021 (Deutch); DX060. Specifically, Vita would "[d]evelop

the basic design" of a deployment wheel, which would include, among other things, a

"basic layout and projected cost to build." DX060.003. The purpose of this study was to

determine if Vita could do the work and how much it would cost; there was no obligation

or contract for Foro to hire Vita to build anything. *Id.*; Trial Tr. 126:22-127:23, Aug. 11,

2021 (Shaaban).

32. Foro agreed to have Vita perform the feasibility study on July 18, 2014, *see* PX018, and

the Parties executed a mutual Non-Disclosure and Restricted Use Agreement (the "NDA"[6])

on July 29, 2014. PX001; PX146; Trial Tr. 84:15-17, Aug. 11, 2021 (Shaaban). Foro

anticipated that, at the conclusion of the feasibility study, Vita would provide a design of

the deployment wheel that provided sufficient detail for manufacturing the equipment.

Trial Tr. 122:11-24, Aug. 12, 2021 (Marshall). Foro, however, received only a "very simple

concept." *Id.* at 122:17-19.

**G.  The NDA**

---

[5] A "skid" is the metal framing in which a piece of equipment sits.  A skid allows the equipment to
be moved via forklift and to be stationary while in use. Trial Tr. 92:14-20, Aug. 10, 2021 (Byrd);
Trial Tr. 127:13-19, Aug. 12, 2021 (Marshall).

[6] During trial, the parties referred to the NDA as both the "confidentiality agreement" and the
"non-disclosure agreement," but Vita's counsel confirmed these phrases referred to the same
document, and Foro's counsel did not object. Trial Tr. 82:5-10, Aug. 11, 2021. Here, the Court
refers to it as "the NDA."

33. Section 2 of the NDA provides: "'Confidential Information and Material' means the information the information described in Exhibit A and Exhibit B and any other information disclosed orally, in writing, or by any other medium, by either Party to the other Party of a competitively sensitive or proprietary nature, whether or not marked confidential or proprietary, including, without limitation, information relating to projects, designs, products, financial statements, forecasts, know-how, and trade secrets. Each Party shall take reasonable steps to identify for the benefit of the other Party and its respective personnel any Confidential Information and Material, including using confidentiality notices where appropriate." PX001 § 2. Exhibit B, mentioned above, notes that "Confidential Information of VITA INTERNATIONAL includes . . . Information, material, data and know-how regarding coil tubing powered circular/wheel type injector method, apparatus design, testing, applications, and performance." *Id.* Exh. B.

34. However, Section 3 of the NDA expressly excludes certain categories of information from the scope of Confidential Information and Material. PX001 § 3. Notably excluded is anything that "is now, or hereafter becomes, through no act or failure to act on the part of the Receiving Party, [information] generally known or available to the public," *id.* § 3(a), and anything that "was known by the Receiving Party before receiving such information from the Disclosing Party." *Id.* § 3(b). Foro's employees understood how this provision operated in practice. Trial Tr. 136:16-137:3, Aug. 12, 2021 (Marshall) ("Q. So information that's generally known, information that's available to the public, or information that was known by Foro, your understanding is that that wouldn't have been covered by the NDA, right? A. That's correct.").

35. Section 5 of the NDA places restrictions on the disclosure of a party's Confidential Information and Material by the Receiving Party, as defined in the NDA. PX001 § 5. The NDA applies to Confidential Information and Material—not subject to the exclusions provided for above—received from the Disclosing Party. *Id.* § 5(b). Nowhere does the NDA mention derivative works.

### H.  Vita Conducts the Feasibility Study

36. Vita hired Alex Ritter in October 2014 to develop a frac sand separator, a piece of machinery that would move sand used in oil-field fracking. Trial Tr. 86:15-25, Aug. 11, 2021 (Shaaban); Trial Tr. 163:7-24, Aug. 10, 2021 (Ritter). Ritter had never worked for Vita, and most of Ritter's professional experience was in truck maintenance. Trial Tr. 199:8-25, Aug. 10, 2021 (Ritter); DX061.

37. Ritter had never designed oil and gas equipment. Nor had he ever designed or worked with any coiled tubing or other injection equipment. Trial Tr. 199:5-7, Aug. 10, 2021 (Ritter) and 168:19-25. Ritter further testified that other than the one year he spent at Vita, he: (1) had no experience with well decommissioning projects; (2) had never designed equipment for well intervention services; (3) had never been involved with the design, building, or testing of a wheel-style injector; (4) had no experience in designing, building, or testing umbilical systems, and; (6) including his time at Vita, had never designed any equipment certified for use in the North Sea. *Id.* at 200:24-201:21 (Ritter).

38. Despite Ritter's lack of experience with technology like the one at issue, he was the only engineer working on the feasibility study. PX025. Vita employed a more experienced engineer, Danny Nguyen (Vita's "Chief Design Engineer"), but Nguyen did not work on the feasibility study because he was too busy. Trial Tr. 207:15-208:1, Aug. 10, 2021

(Ritter). The Foro project therefore became Ritter's project. *Id.* at 208:2-4. He began working on the project on December 15, 2014. DX006; PX039.

39. Shaaban provided Ritter with some publicly available photographs of Vita's previous coiled tubing units on December 13, *see* PX028-PX036, but little documentation was thereafter provided to Ritter. Trial Tr. 223:23-224:5, Aug. 10, 2021 (Ritter).

40. By January 6, 2015, Ritter had drafted a concept for the deployment wheel. PX061. Shabaan provided the AutoCAD sketches to Foro on January 7, 2015. DX001. On January 13, 2015, Ritter sent Shaaban a revised set of conceptual drawings, DX002, which were forwarded to Foro for review on January 14, 2015. DX003.

**I.   Vita's Conceptual Drawings**

41. These initial "conceptual drawings" were not final drawings that were ready for manufacture; rather, they were the first step of the engineering process. Trial Tr. 199:13-200-8, Aug. 12, 2021 (Newman). Foro's technical expert, Ken Newman, explained that he considered the drawings Foro received to be "concept drawings" akin to "back-of-the-napkin drawings" that are "typically crude drawings that are used to convey a concept." *Id.*

42. Vita charged Foro an hourly rate for this work, and Foro paid in full. Trial Tr. 24:14-20, Aug. 11, 2021 (Deutch). In total, Vita charged Foro $27,671.06. DX006; DX007. Newman, who has designed and patented numerous types of coiled tubing equipment in his career, testified that his company could have completed similar design work for approximately $8,000. Trial Tr. 213:24-214:8, Aug. 12, 2021 (Newman).

43. Vita never completed "a full design." Trial Tr. 122:11-24, Aug. 12, 2021 (Marshall). Foro never received anything beyond the conceptual drawings, which were two-dimensional AutoCAD drawings. *See* Trial Tr. 105:16-21, Aug. 10, 2021 (Byrd). These conceptual

drawings contained "very simple" illustrations of the deployment wheel, providing Foro with only a high-level overview of the concept and general descriptions of common components of the equipment (i.e., "pinch roller"; "planetary gear"). Trial Tr. 122:11-24, Aug. 12, 2021 (Marshall); DX003.

44. The concept had 14 hold-down rollers, as in the 1998 Patent. *Compare* DX003.004, *with* DX012.003. The hold-down rollers were hydraulically operated so they could pivot upwards 90 degrees to allow for side-loading—like the 1998 Patent with a quick-release pin. *Compare* DX003.002 *with* DX012.003. Other patents published before Foro received Vita's depicted the same features. DX010; DX012 (Vita expired patent depicting a CT unit); DX025 (Premier coil patent depicting hydraulically operated hold-down rollers). Foro also owned a deployment mechanism that "used seven sets of rollers on [the] sheave wheel that [it] had built in 2013." Trial Tr. 126:7-13, Aug. 12, 2013 (Marshall); DX036.

45. Foro's own patent, which was filed August 14, 2013, also showed the features depicted in the conceptual drawings. DX026; Trial Tr. 26:13-25, Aug. 11, 2021 (Deutch). For example, Figure 11 of Foro's patent shows "a deployment wheel that [Foro] knew [it] would need to make the right angle with the umbilical . . . and some hydraulic mechanisms capable of side-loading." Trial Tr. 27:1-6, Aug. 11, 2021 (Deutch). Figure 14-A shows "an injector sheave with seven sets of rollers" that could be clamped with a lever. *Id.* at 27:13-24.

46. Another company, Premier Coil, had published a patent application months earlier with almost identical hydraulic hold-down rollers. *Compare* DX003.002 *with* DX025; *see* DX084. Newman testified that these functioned "exactly the same way" as those in Vita's conceptual design. Trial Tr. 206:7-207:21, Aug. 12, 2021 (Newman); DX025; DX084. Byrd agreed that the hydraulically activated hold down rollers in the Premier Coil patent

had a "similar pivoting mechanism as the Vita 2015 Ritter design." Trial Tr. 150:5-151:1, Aug. 10, 2021 (Byrd).

47. Moreover, several commercial alternatives that were available before the creation of Vita's conceptual drawings had the same features. *See*, *e.g.*, DX023 (powered sheave wheel with hold-down rollers and side-loading capability); DX022 (large-diameter coiled tubing injector with a hydraulic motor, planetary gear, and hold-down rollers); DX032 (powered sheave wheel for umbilical that is driven hydraulically with a planetary gear and motor). Newman confirmed that these options depicted the features in Vita's conceptual design, and that all could have reliably deployed the MaCC. Trial Tr. 210:11-213:8, Aug. 12, 2021 (Newman).

48. The conceptual drawings also lacked any of the information that would be necessary to move to the production stage. *Id.*; Trial Tr. 35:4-24, Aug. 11, 2021 (Deutch). The conceptual drawings did not include dimensions, had no information on materials, provided no insight into welds, and were submitted without a bill of materials.[7] Trial Tr. 23:2-21, Aug. 11, 2021 (Deutch); Trial Tr. 122:13-23, 123:6-11, and 124:2-7, Aug. 12, 2021 (Marshall); Trial Tr. 215:24-216:18, Aug. 12, 2021 (Newman); Trial Tr. 220:14-221:5, Aug. 10, 2021 (Ritter) (testifying that a manufacturer would "absolutely" need more detailed drawings in order build from the conceptual drawings); DX003.

49. The conceptual drawings did not present any novel information. Trial Tr. 123:6-11, Aug. 12, 2021 (Marshall) ("There's nothing [in the conceptual drawings] that we hadn't seen in previous applications, including things from [Vita's] website on what . . . consisted of a

---

[7] The only dimensions included in the drawings were of component parts, which Vita intended to purchase off-the-shelf from suppliers. Trial Tr. 123:21-124:1, Aug. 12, 2021 (Marshall).

injector wheel."). The drawings merely contained depictions of the deployment wheel's general component parts—which Vita would have had to acquire from third-party vendors—or "features Foro had given [to Vita]." *Id.* at 123:12-124:7.

50. Ritter acknowledged that his final work product lacked these specifics and explained that the "next step" would have been "doing detailed engineering, which would have been for the manufacturing, taking the drawings that I had and started doing the detailing for the component parts to manufacture the unit." Trial Tr. 185:3-16, Aug. 10, 2021 (Ritter). Ritter had not provided Foro with the weight of equipment, weld specifications, the friction coefficient, or the thickness of structural steel; such calculations had not been done or were "in [Ritter's] head." *Id.* at 217:5-220:2.

51. Vita's expert witness, Byrd, similarly testified that even a "talented manufacturing facility" would need additional specification information to build from the conceptual drawings Foro received. Trial Tr. 105:9-108:9, Aug. 10, 2021 (Byrd). Foro's technical expert witness, Ken Newman, agreed, noting that what Vita provided is "just the first step, the concept," which was still subject to change. Trial Tr. 199:14-200:14, Aug. 12, 2021 (Newman). And because the drawings were given to Foro in PDF format, Foro never received the "intelligence" that would have been contained in an AutoCAD file. *Id.* at 200:23-201:5. Receiving a PDF is "not like an AutoCAD file that has all the dimensions in it, for example. It's just a picture." *Id.*

52. Neither the drawings themselves nor the emails transmitting the drawings included a confidentiality notice. DX001; DX003. Vita did not inform Foro that it considered these conceptual drawings to contain any confidential or proprietary information. Trial Tr. 131:7-

11, Aug. 11, 2021 (Shaaban); Trial Tr. 23:2-21, Aug. 11, 2021 (Deutch); Trial Tr. 137:17:24, Aug. 12, 2021 (Marshall).

### J.   Vita's Experience with Injector Wheels

53. Vita has claimed that Ritter's work on the conceptual drawings was attributable to Vita's institutional knowledge on injector wheels. However, the Court finds that (1) Vita had limited institutional knowledge specific to the type of deployment mechanism Foro sought, and (2) even if Vita did, Ritter did not rely on such knowledge.

54. Vita has engineered and manufactured just four injector wheels in total. Trial Tr. 119:24-120:4, Aug. 11, 2021 (Shaaban). Vita's first injector wheel was manufactured in 1995, after Vita acquired a license to the original patent from Fleet Cementers, for which Vita agreed to pay Fleet Cementers $10,000 per wheel that Vita manufactured and sold. Trial Tr. 121:17-122:1, Aug. 11, 2021 (Shaaban). Vita stopped engineering injector wheels sometime in 2002. Trial Tr. 57:10-18, Aug. 11, 2021 (Shaaban). Thus, by the time Ritter arrived at Vita, the only employee left who had worked on injector wheels and the associated patent was Shaaban himself.[8] Trial Tr. 117:24-118:25, Aug. 11., 2021 (Shaaban).

55. But even assuming Vita had relevant institutional knowledge, Ritter did not rely on it or incorporate it into the conceptual drawings. While he corresponded with Shabaan about his work, Ritter alone created the conceptual drawings that Foro received. Trial Tr. 210:24-15,

---

[8] As previously noted, Wally McClanahan may still have been employed by Vita during this period, but Shaaban testified that McClanahan was "[b]usy with other things" and was not involved with the Foro project. Trial Tr. 118:19-119:3, Aug. 11, 2021 (Shaaban).

Aug. 10, 2021 (Ritter); *id.* at 214:24- 215:22; *id.* at 207:22-208:4; PX061; DX001-003; DX067. He did not rely on any Vita documentation in completing his final work product besides publicly available photographs and a blueprint of Vita's coiled tubing unit depicted in its expired 1998 patent. Trial Tr. 223:23-224:5, Aug. 10, 2021 (Ritter). Ritter also testified that, to the extent he performed engineering calculations, he did not share them with anyone else and instead wrote the calculations down "in [his] head." *Id.* at 218:1-220:2.

**K.  Vita's Proposal to Build the Deployment Wheel**

56. As Vita was preparing its cost-proposal to engineer and build the wheel, Foro was assisting Ritter with finding cheaper off-the-shelf components. PX091. Marshall began assisting Ritter with sourcing component parts because one off-the-shelf component, the planetary gear, was expected to be "the largest chunk of costs associated with preliminary price." Trial Tr. 77:9- 17, Aug. 12, 2021 (Marshall).

57. Ritter drafted a cost-proposal to fully engineer and build the deployment wheel. Trial Tr. 164:19-165:2, Aug. 10, 2021 (Ritter). Shaaban sent this proposal to Foro for review on March 5, 2015. DX009.

58. In Vita's proposal, Vita offered to finish engineering its concept, test the equipment, and build the equipment for $243,812. DX009.004. Vita was offering to sell the as-built wheel to Foro for Foro's commercial use. *Id.* at DX009.003; Trial Tr. 144:22-145:2, Aug. 12, 2021 (Marshall). That is, the proposal contains no limitations on how Foro would be able to use the deployment wheel if it had purchased one from Vita. DX009; Trial Tr. 134:18-135:10, Aug. 12, 2021 (Shaaban). Shaaban testified that, had Vita's proposal been accepted, Foro would have owned the wheel and been able to use it as Foro saw fit. *Id.* at

134:18-22. Vita would not have placed usage restrictions on Foro's use of the wheel or prevented Foro from displaying the wheel commercially.[9] *Id.* at 134:23-135:10.

59. Vita's "Terms and Conditions of Sale" attached to the proposal confirms this, as Section 5 (Use of Products) states that Foro would have been given the right to use the deployment wheel "in the form delivered by [Vita]." DX009.006 § 5. Section 7 (Delivery, Title & Risk) states that title to the deployment wheel would have passed "at the time of delivery." *Id.* § 7.

60. Foro believed that Vita's price of $243,812 was high, as Foro's previous deployment mechanism for the MaCC was less than half of the price in Vita's proposal. Trial Tr. 258:11-260:11, Aug. 10, 2021 (Deutch); DX036.001.

61. Further, by the time Foro received Vita's proposal, key aspects of Foro's planned commercial work for the MaCC had changed. Trial Tr. 22:1-17, Aug. 11, 2021 (Deutch). Most relevantly, Foro (1) decided to use an umbilical instead of coiled tubing to deploy the MaCC and (2) determined that its offshore decommissioning work would likely take place in the North Sea and off the coast of Norway rather than the Gulf of Mexico. Trial Tr. 77:19-78:13, Aug. 12, 2021 (Marshall). These changes were important because Vita had designed the deployment wheel to deploy coiled tubing, and the location change meant the deployment wheel would need to meet stricter specifications (i.e., "DNV" and "NORSOK") to be operable in the North Sea. *Id.*; Trial Tr. 48:16-22, Aug. 12, 2021

---

[9] Shaaban testified that the only potential usage restrictions on Foro's use of the wheel would have been restrictions rooting from the NDA. *See* Trial Tr. 134:18-135:10, Aug. 12, 2021 (Shaaban). But to the contrary, the Terms and Conditions of Sale attached to Vita's proposal contained an "Entire Agreement" clause, meaning the proposal would have superseded the NDA, along with "all previous communications, representations, understandings and agreements, either oral or written, between [Foro and Vita] with respect to the subject matter." DX009.007; Trial Tr. 146:14-147:2, Aug. 12, 2021 (Marshall).

(Edwards) (explaining that the specifications equipment used in the North Sea must meet are "the most stringent requirements that exist globally. So very, very unique. Very strict requirements"). Vita's proposal for the deployment wheel stated that it is for a wheel "to inject and withdraw coil[ed] tubing" and "not DNV certified for use in the North Sea, but [] built to conform to SEPco 00055 [Gulf of Mexico] requirements." DX009.002.

62. Foro already had concerns about Vita's limited experience working with DNV and NORSOK standards. Trial Tr. 133:17-134:4, Aug. 11, 2021 (Shaaban); *id.* at 79:20-80:1. There was no evidence presented that Vita had ever built anything that was certified to NORSOK standards. Trial Tr. 197:6-198:7, Aug. 12, 2021 (Newman).

63. Therefore, Foro did not accept Vita's proposal to engineer, test, and build the deployment wheel. Trial Tr. 100:7-23, Aug. 12, 2021 (Marshall); PX112. On March 15, 2015, Foro received its final invoice from Vita for the feasibility study, which Foro paid. DX007. This concluded the Parties' business.

**L.  Foro Engages Hytech Norway**

64. In determining that the deployment mechanism for the MaCC may need to meet the highly specific DNV and NORSOK standards, Foro began considering Norwegian vendors with a track record that could engineer and construct a deployment wheel. Trial Tr. 65:23- 66:1, Aug. 12, 2021 (Marshall). This was because Foro knew "there was very limited competency in North America for someone to actually build [the] unit and have it certified to [North Sea and Norwegian] standards." *Id.* at 66:13-23.

65. Foro had an existing relationship with Hytech AS, Engineering & Services ("Hytech Norway"). Foro had previously worked with Hytech Norway to construct other North Sea

equipment and already had an NDA with Hytech Norway. Trial Tr. 65:13-22, Aug. 12, 2021 (Marshall); PX026 (Hytech Norway-Foro NDA).

66. Marshall sent Erik Skogen the conceptual drawings Vita had provided to Foro as well as Vita's proposal for Skogen's reference. Trial Tr. 71:1-5, Aug. 12, 2021 (Marshall); PX066; PX107. Skogen was Foro's person on the ground in Norway. Trial Tr. 21:18-22:2, Aug. 12, 2021 (Edwards); Trial Tr. 257:7-258:1, Aug. 10, 2021 (Deutch). Skogen was paid by Foro, had a Foro email address, and was responsible for, among other things, engaging with Norwegian vendors. Trial Tr. 179:20-180:8, Aug. 12, 2021 (Marshall); *id.* at 70:5-21 (Marshall) (Skogen was "treated like an employee at Foro"). Skogen had a consulting agreement with Foro and had entered into an NDA with Foro. Trial Tr. 257:7-258:1, Aug. 10, 2021 (Deutch) ("Mr. Skogen was a consultant that worked for [our] company that was under NDA …. He was a consultant under a consulting agreement, and we had agreements with him – NDAs with him in a consulting agreement."). Under Foro and Vita's NDA, "[t]he Receiving Party may disclose the Disclosing Party's Confidential Information and Material to its responsible employees and professional advisers with a bona fide need to know such Confidential Information and Material." PX001 § 7.

67. Marshall testified that, to the best of his knowledge, Skogen did not share the Vita drawings or Vita's proposal with anyone outside of Foro. Trial Tr. 70:22-25, Aug. 12, 2021 (Marshall). No evidence was presented at trial that Skogen shared the Vita drawings or Vita proposal with anyone.

68. Once Foro realized it would need another vendor for its North Sea deployment wheel, Foro conducted a patent search to confirm that Vita did not have a patent relating to any deployment wheel, which would Foro "freedom to operate" and the ability to consider

alternative vendors. Trial Tr. 143:22-144:3, Aug. 12, 2021 (Marshall). Foro's search confirmed that Vita's only potentially applicable patent had expired. PX217; Trial Tr. 119:1-7, Aug. 11, 2021 (Shaaban).

69. Foro then provided Hytech Norway with Foro's own three-dimensional drawings of a deployment wheel, which Marshall had created in a computer-program called Solidworks, along with a chart outlining certain specifications for the deployment wheel. PX044.

70. Marshall testified that he created the Solidworks drawings based on a 2013 Foro engineering design. Trial Tr. 127:7-128:2, Aug. 12, 2021 (Marshall). He further states that he did not refer to the Vita drawings when completing the Solidworks drawing, *id.* at 125:5-9, whose features were either established or already known by Foro. *Id.* at 125:5-129:3.

71. The Solidworks drawings contained a deployment wheel containing seven sets of rollers attached to pivoting arms. *Id.* at 125:10-20. Foro already had a deployment mechanism that "used seven sets of rollers on [the] sheave wheel that [it] had built in 2013." *Id.* at 126:7-13. Foro had also "specced that [it] wanted to use hydraulics … to be able to clamp down with a frictional force," and the only logical way of accomplishing that was a pivoting arm. *Id.* at 126:14- 20.

72. Marshall was familiar with these features from his time spent working at Norse Cutting & Abandonment, where he had used a very similar deployment mechanism "with an umbilical that was made up on [the] surface[] and [] side-loaded into a very similar sheave wheel that had some clamps that went down over the top." *Id.* at 128:15-129:3. Because Marshall had used seven sets of rollers in a previous deployment mechanism and because he provided the base spec for the pivoting arm feature, he reasonably did not believe that either feature was proprietary to Vita. *Id.* at 125:21-126:20.

73. The substantive information contained in the corresponding specifications chart sent to Hytech Norway was provided by Foro or a third-party vendor. The 72-inch wheel bend diameter, skid base dimension, skid width, skid height, skid weight, and FlatPak Straightener information came directly from Foro. *Id*. The wheel skate block information was "standard coiled tubing practice" that Foro knew from experience, and a third party provided the friction coefficient, deployment speed, and drive system information. *Id.*; PX062; Trial Tr. 132:21-133:7, Aug. 12, 2021 (Marshall). Thus, Vita did not provide that any of its confidential information was incorporated into the Solidworks drawings that Skogen sent to Hytech Norway. *See* Trial Tr. 125:5-129:3, Aug. 12, 2021 (Marshall).

74. On April 1, 2015, Hytech Norway sent Foro a formal proposal to design, engineer, test, and build a North Sea certified deployment wheel for $173,142—or $70,760 less than the price in Vita's proposal. On April 6, 2015, Foro accepted Hytech Norway's proposal. Trial Tr. 80:18- 81:4, Aug. 12, 2021 (Marshall); PX218. In April 2016, Foro received delivery of the deployment wheel from Hytech Norway at Foro's United Kingdom facility in Aberdeen, Scotland. Trial Tr. 65:5-12, Aug. 12, 2021 (Marshall). The Hytech Norway deployment wheel has never entered or been used in the United States. Trial Tr. 16:17-24, Aug. 11, 2021 (Deutch).

**M. Foro's Offshore Decommissioning Activities**

75. The MaCC tool was used commercially with the Hytech Norway deployment wheel nine times, all in the North Sea between 2016 and 2019. *See* Trial Tr. 15:22-16:8, Aug. 11, 2021 (Deutch).

76. When the Hytech Norway deployment wheel was used or displayed, anyone could have visually observed the wheel and inspected its features, which are all "very visible." Trial

Tr. 216:3-18, Aug. 12, 2021 (Newman); Trial Tr. 141:6-9, Aug. 12, 2021 (Marshall); Trial Tr. 15:22- 16:8, Aug. 11, 2021 (Deutch); Trial Tr. 229:7-20, Aug. 12, 2021 (Ritter); Trial Tr. 153:22-154:20, Aug. 10, 2021 (Byrd). Any concept included in the Vita drawings that was also present in the Hytech Norway wheel could be visually observed as soon as the wheel was used. Trial Tr. 153:22-154:20, Aug. 10, 2021 (Byrd); Trial Tr. 215:10-23, Aug. 12, 2021 (Newman).

77. Foro's first offshore decommissioning job in the North Sea was for ConocoPhillips Skandinaivia AS ("ConocoPhillips"); this was "the very first time [Foro] tested [its] tooling system offshore." Trial Tr. 19:4-22, Aug. 11, 2021 (Deutch). Because this was a trial for ConocoPhillips as well, Foro used line-item billing so ConocoPhillips could get "a better understanding of what the equipment was." *Id.*

78. Foro invoiced ConocoPhillips a total of $410,201.22 for the work it performed. DX052. Of this total, $36,000 was for Hytech Norway deployment wheel, billed at a rate of $2,000 per day. DX052; Trial Tr. 19:10-13, Aug. 11, 2021 (Deutch).

79. No other invoices that Foro sent to customers for jobs performed in the North Sea had the Hytech Norway deployment wheel broken out as a line item. *Id.* at 22:8-12. A ConocoPhillips "call-off" document, however, does identify a "primary" injector wheel and a "back-up" injector wheel—which was the Foro non-powered sheave wheel— meaning Foro had a customer-approved alternative deployment mechanism that could be used when deploying the MaCC offshore. DX053 (items 7 and 8); Trial Tr. 20:9-25, Aug. 13, 2021 (Durham).

80. In total, Foro made approximately $2.3 million in revenue for all offshore services from 2016 to 2020, with $1.88 million attributable to use of the MaCC, and the remaining

attributable to services that do not use the MaCC and do not use a deployment wheel. Trial Tr. 12:18-20, Aug. 11, 2021 (Deutch); Trial Tr. 12:23-13:9, Aug. 13, 2021 (Durham); DX054.

81. Foro did not make a profit on these offshore services, and "lost north of $12 million" during that same period. *Id.* at 14:23-25. Foro's North Sea expenses were comprised of two categories: (1) "COGS" (or costs of goods sold), which includes items such as wages and benefits, repair and maintenance, and equipment rental and services costs, and (2) "Operating Expenses," which includes items such as project expense, sales and marketing, travel, facilities, and insurance. DX054.02; Trial Tr. 14:12-15:2, Aug. 13, 2021 (Durham).[10] Applying the expenses to Foro's revenue "results in the operating profit" of "a negative $11.1 million through 2019." Trial Tr. 15:15-16:2, Aug. 13, 2021 (Durham).

82. Between 2018 and 2019, Foro had two additional deployment wheels constructed by a company based out of the United Kingdom called Hytec Hydraulics ("Hytec UK").[11] Trial Tr. 42:8-16, Aug. 11, 2021 (Deutch); Trial Tr. 262:8-21, Aug. 10, 2021(Deutch); Trial Tr. 111:25- 112:12, Aug. 12, 2021 (Marshall). Each Hytec UK deployment wheel cost Foro roughly £85,000, or $110,000. Trial Tr. 112:13-113:1, Aug. 12, 2021 (Marshall).

83. Vita has never pled, and no evidence was offered at trial, that these deployment wheels are based on Vita's confidential or proprietary information. The only testimony about the

---

[10] Durham testified that in order to verify the numbers on Foro's North Sea profit and loss statement, *see* DX054.002, he (1) had discussions with Deutch and David Boersma, Foro's CFO, about each of the line items to understand what was included and why they were being accounted for; (2) tied the revenues stated back to Foro's invoices produced during this dispute to verify the amounts that were actually billed by Foro for its services; and (3) looked at Foro's detailed financial records from its accounting system, both at the UK level and Foro Energy, Inc. level. Trial Tr. 16:3- 24, Aug. 13, 2021 (Durham).
[11] Hytech Norway and Hytec UK are not affiliated with each other, despite the similarity in name. Trial Tr. 74:3-21, Aug. 12, 2021 (Marshall).

design of the Hytec UK wheel was from Foro's expert, who testified that it was very different from the Hytech Norway wheel. Trial Tr. 223:15-18, Aug. 12, 2021 (Newman).

84. Foro's offshore decommissioning business is now being shut down. Trial Tr. 11:1- 11, Aug. 11, 2021 (Deutch). Foro has put the headquarters of its offshore operations up for rent, and it plans to write off all assets of that portion of its business. Trial Tr. 11:12-19 and 45:19-45:5, Aug. 11, 2021 (Deutch); DX081.

## III.   CONCLUSIONS OF LAW

### A. Jurisdiction

85. This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1836(c). This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

### B. Vita Has Not Shown that Foro Misappropriated Any Trade Secrets Under DTSA or TUTSA.

86. To prevail on its claim for trade secret misappropriation under the Texas Uniform Trade Secrets Act ("TUTSA") or the federal Defend Trade Secrets Act ("DTSA"), Vita must establish (1) the existence of a trade secret and (2) misappropriation by Foro. Tex. Civ. Prac. & Rem. Code §§ 134A.002-134A.003; 18 U.S.C. § 1831 et seq.; *Miner, Ltd. v. Anguiano*, 383 F. Supp. 3d 682, 702 (W.D. Tex. 2019).

87. TUTSA defines a "trade secret" as information, including any design, pattern, or plan, where:

    a. the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret; and

b. the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

Tex. Civ. Prac. & Rem. Code § 134A.002(6); 18 U.S.C. § 1839(3); *Miner*, 383 F. Supp. 3d at 702 (noting that definitions in TUTSA are "identical" to those in the DTSA); *see also Agency Solutions.Com, LLC v. TriZetto Grp., Inc.*, 819 F. Supp. 2d 1001, 1021 (E.D. Cal. 2011) ("information is not necessarily a trade secret simply because it is known by one party and not by the other.").

88. Whether a trade secret exists is a question of fact. *Wellogix, Inc. v. Accenture, LLP*, 716 F.3d 867, 874 (5th Cir. 2013).

### a. *Vita Has Not Established That Its Conceptual Drawings are Trade Secrets*

89. Vita asserted that the information it provided Foro through its conceptual drawings constituted a trade secret. Trial Tr. 27:3-9, Aug. 10, 2021. It noted that its technical expert witness, Byrd, would "drill down on the technology involved, so the Court can determine whether there is, in fact, a trade secret involved." *Id.*

90. At trial, Vita's focus was on one specific feature of its deployment wheel concept: "side-loading," which Byrd claimed "did not exist in the industry before Vita actually developed [it]." Trial Tr. 109:17-110:9, Aug. 10, 2021 (Byrd). Byrd emphasized the import of side-loading numerous times, referring to it as the "essential characteristic" of Vita's conceptual design. *Id.* at 79:1-17 ("[T]he real characteristic of the Vita system that is significant here is the ability to side load coiled tubing and umbilicals … without hav[ing] to pass [] the umbilical … through an injector head. That is the characteristics that sets [] Vita's system

apart from anything that exists in the industry prior to Vita's development."); *id.* at 123:18-24 ("The previous patent work did not include the capability to … side load the coiled tubing or umbilical," and this was "what really separates all of the different deployment wheels that have been developed by others from … the Vita system."); *id.* at 126:10-16 ("And as I mentioned before, it's the capability to side load that is unique."); *id.* at 127:7-15 ("So the essential characteristic of the system that [Foro] asked Vita to develop was side-loading capability and the ability to … pass through an injector head.").

91. On cross-examination, Byrd further testified that the innovation separating Vita's expired 1998 Patent from the alleged trade secret was the ability of the hold-down rollers to open on one side to allow for side-loading. Trial Tr. 145:1-25, Aug. 10, 2021 (Byrd).

92. But when confronted with the 1998 Patent itself, Byrd was forced to concede that the 1998 Patent did in fact describe side-loading because the hold-down rollers in that patent had a quick-release pin allowing the roller to pivot up 90 degrees. *Id.* at Trial Tr. 146:3-147:15; DX012; DX083.

93. After conceding that the 1998 Patent described side-loading, Byrd testified that the key innovation was making the design "more practical" by adding hydraulics to activate the hold-down rollers so one would be able to side-load "expeditiously." Trial Tr. 148:1-15, Aug. 10, 2021 (Byrd).

94. Byrd was then confronted with a patent filed by Premier Coil Solutions in November 2014, which depicted an injector with hydraulically activated hold-down rollers. *Id.* at 149:1-150:15; DX025; DX031. Byrd was forced to concede that the hydraulically activated hold-down rollers feature depicted in Vita's conceptual drawings was also in the public domain. *Id.* at 150:16-152:5.

95. Accordingly, Vita's conceptual drawings are not trade secrets, because the "essential characteristic" of the design was publicly disclosed by Vita's own expired patent.

       i.  *Vita's Concept is Generally Known*

96. For information to be entitled to trade secret protection, "it is elemental that '[t]he subject matter of a trade secret must be secret' . . . The subject of a trade secret 'must not be of public knowledge or of general knowledge in the trade or business." *Carson Prods. Co. v. Califano*, 594 F.2d 453, 461 (5th Cir. 1979); *A.M. Castle & Co. v. Byrne*, 123 F. Supp. 3d 895, 901 (S.D. Tex. 2015) ("Texas law requires that a trade secret be 'secret,' i.e., that it be neither generally known by others in the same business ….").

97. Here, the Court concludes based on the record evidence that Vita's conceptual drawings are not secret; rather, they illustrate a "generally known" concept in the oil and gas industry. *Agency Solutions.Com, LLC*, 819 F. Supp. 2d at 1022 (holding that there is no trade secret where there is "information generally known to other persons skilled in the same field").

98. Vita's deployment wheel concept, including the side-loading feature, is not a novel or unique concept. Trial Tr. 128:15-24, Aug. 12, 2021 (Marshall) ("Q. And how about the rollers [] that go up and provide for side-loading capability? Was that a new feature . . . [?] A. No. No, that's definitely not a new feature."). Deployment mechanisms are common in the oil and gas industry and have been utilized both onshore and offshore for decades. Trial Tr. 23:20- 24:17, Aug. 12, 2021 (Edwards) (noting that there are "a lot of people out there that provide these wheels" and Vita is "just one of the numerous vendors out there"); *id.* at 25:19-26:2.

99. Beyond the general pervasiveness of the deployment wheel concept in the oil and gas industry, the features in Vita's concept themselves are also common. Vita itself disclosed

side-loading in its 1998 Patent, which Vita alleged was the "essential characteristic" of the mechanism.  Trial Tr. 127:7-15, Aug. 10, 2021 (Byrd); DX083.

100.      Further, Foro's own patent, which was published long before Foro initially contacted Vita, depicts many of the features in the conceptual drawings. Trial Tr. 26:13-25, Aug. 11, 2021 (Deutch); DX026. Figure 11 of this patent shows "a deployment wheel that [Foro] knew [it] would need to make the right angle with the umbilical . . . and some hydraulic mechanisms capable of side-loading." Trial Tr. 27:1-6, Aug. 11, 2021 (Deutch). Figure 14-A of this patent shows "an injector sheave with seven sets of rollers" that could be clamped with a lever. *Id.* at 27:13-24.

101.      Side-loading was also a feature of Foro's non-powered sheave wheel that it had procured to deploy the MaCC offshore, *see* Trial Tr. 196:16-197:5, Aug. 12, 2021 (Newman); DX082, and a feature of the deployment mechanism Foro had previously purchased from Power Hydraulics. Trial Tr. 21:15-24, Aug. 12, 2021 (Deutch); DX036.

102.      Moreover, Premier Coil's 2014 patent, depicted hydraulically operated hold-down rollers that, according to Newman, functioned "exactly the same way" as those in Vita's conceptual design. Trial Tr. 206:7-207:21, Aug. 12, 2021 (Newman); DX025; DX084. Byrd agreed that the hydraulically activated hold down rollers in the Premier Coil 2014 patent had a "similar pivoting mechanism as the Vita 2015 Ritter design." Trial Tr. 150:5-151:1, Aug. 10, 2021 (Byrd).

103.      In addition to the individual features of Vita's concept being described in patents, there are a variety of similar commercially available alternatives that contain the same features. Trial Tr. 210:11-213:8, Aug. 12, 2021 (Newman); DX022; DX023; DX032; DX036; DX082.

104.     The Court thus finds that neither Vita's general concept nor the concept's individual features were unique. The concept was generally known, which makes it "ineligible for trade secret protection." *Stemtech Int'l Inc. v. Drapeau*, 2016 WL 7443181, at *12 (W.D. Tex. Dec. 27, 2016) (denying trade secret status to information where the details of plaintiff's products were "available to anyone with an internet connection").

### ii.   *Vita's Concept is Readily Ascertainable By Proper Means*

105.     "Under Texas law, information that is generally known or readily available by independent investigation is not secret for purposes of trade secrecy." *Tewari De-Ox Sys., Inc. v. Mountain States/Rosen, LLC*, 637 F.3d 604, 612 (5th Cir. 2011); *cf. Wellogix, Inc. v. Accenture, LLP*, 823 F. Supp. 2d 555, 563 (S.D. Tex. 2011) (Ellison, J.) ("Texas law recognizes that information published in a patent application becomes public and loses trade secret status.").

106.     Here, Vita admitted that the "essential characteristic" depicted in its conceptual drawings was disclosed in its own 1998 Patent. Trial Tr. 126:21-127:17, Aug. 10, 2021 (Byrd); Trial Tr. 204:13-206:1, Aug. 12, 2021 (Newman); DX012; DX083. Vita's expert, Byrd, testified that Vita's alleged trade secret was the concept of "side-loading." Trial Tr. 109:17-110:9, Aug. 10, 2021 (Byrd). On cross-examination, however, Byrd agreed that the 1998 Patent did in fact disclose side-loading, Trial Tr. 146:3-147:15, Aug. 10, 2021 (Byrd), and that the Premier Coil patent disclosed hydraulically operated hold-down rollers, Trial Tr. 150:5-151:1, Aug. 10, 2021 (Byrd). These constitute "the exact information or details that a plaintiff contends are trade secrets." *Wellogix, Inc.*, 823 F. Supp. 2d at 563; DX012; DX025; DX026; DX083; DX084.

107.     Accordingly, the side-loading process cannot be a trade secret, as it was explicitly

disclosed in Vita's 1998 Patent, DX012, and Premier Coil's patent, DX025. *See Attia v.*

*Google LLC*, 983 F.3d 420, 425-26 (9th Cir. 2020) (applying "well-settled" principle "that

publication of information in a patent application eliminates any trade secrecy"); *Tewari*

*De-Ox Sys., Inc. v. Mountain States/Rosen LLC*, 2013 WL 12234284, at *2 (W.D. Tex.

Mar. 20, 2013).

108.     These features also appeared in Foro's own patent, DX026, and could be seen in a

variety of commercially available alternatives that were created prior to Vita's conceptual

design. DX022; DX023; DX032; DX036; DX082.

109.     Moreover, anyone with reasonable skill in the art could have developed the

deployment wheel concept that Vita delivered. A deployment wheel is not considered to

be a sophisticated or complex piece of equipment. Trial Tr. 29:11-30:1, Aug. 11, 2021

(Deutch). Engineers experienced with using similar deployment mechanisms in the field

testified that they did not consider Vita's conceptual design to be an involved one. Trial

Tr. 213:24-214:8, Aug. 12, 2021 (Newman); Trial Tr. 122:17-24, Aug. 12, 2021

(Marshall); Trial Tr. 29:11-30:1, Aug. 11, 2021 (Deutch).

110.     Vita's relatively simple deployment wheel concept was disclosed in numerous prior

art references and could have been created by one with reasonable skill in the art.

Accordingly, the concept was readily ascertainable by proper means, and Vita cannot

establish that its conceptual design was a trade secret.

*iii.*   *Every Feature of Vita's Concept is Visually Observable*

111.     To qualify as a trade secret, the information must derive independent economic

value from being secret. *Recif Res., LLC v. Juniper Capital Advisors, L.P.*, 2020 WL

6748049, at *12 (S.D. Tex. Nov. 17, 2020). "Information is valuable when it provides the competitor details about a product or service that give[s] them a competitive advantage." *Miner, Ltd.*, 383 F. Supp. 3d at 703.

112.     Here, however, Vita always intended for its conceptual design to become public. Thus, all critical features of the conceptual drawings, including side-loading, would inevitably have been visually observable. Trial Tr. 141:6-9, Aug. 12, 2021 (Marshall); Trial Tr. 214:15-215:23, Aug. 12, 2021 (Newman).

113.     Vita's expert witness Byrd acknowledged that once the deployment wheel was being used offshore, it would be out on the offshore platform for anyone to see, with dozens of employees from other services companies. Trial Tr. 153:22-154:20, Aug. 10, 2021 (Byrd). Byrd even testified that this included the "novel side-loading feature" of the deployment wheel. *Id.* at 154:8-12.

114.     Vita's engineer Ritter agreed that, once the deployment wheel was out in the open, "everyone could see that the rollers were mounted on pivoting arms." Trial Tr. 229:7-20, Aug. 12, 2021 (Ritter). There are no internal components involved in Vita's concept. Trial Tr. 216:19-21, Aug. 12, 2021 (Newman).

115.     Vita knew that this type of equipment can be copied once it is publicly displayed. Trial Tr. 136:8-20, Aug. 11, 2021 (Shaaban). In prior litigation surrounding Vita's then-patented coil tubing wheel, Shabaan testified under oath that, without a patent, the features of the wheel could be reverse engineered. *Id.* at 136:8-20 (Shaaban).

116.     Vita was also aware that, if it wanted to keep its deployment wheel concept a secret, it could have applied for a patent, as Vita had done previously. Trial Tr. 116:23-117, Aug. 11, 2021 (Shaaban). But Vita never applied to patent this concept. Trial Tr. 205:9-11, Aug. 10, 2021 (Ritter).

117.    Vita has not established that it intended to keep its deployment wheel concept a secret. It is undisputed that, had Foro purchased a deployment wheel from Vita, the wheel could have been used offshore, marketed, or displayed however Foro saw fit. Trial Tr. 134:18-135:10, Aug. 12, 2021 (Shaaban). Anyone could then see every feature of Vita's concept, depriving the concept of any actual or potential value to Vita "outside of a single ephemeral project for a single customer." *Direct Techs., LLC v. Elec. Arts, Inc.*, 836 F.3d 1059, 1071 (9th Cir. 2016) (holding that a flash drive with specific features could not constitute a trade secret because plaintiff had presented no evidence that the design had "actual or potential value" outside of one project); *see also Bellwether Cmty. Credit Union v. Chipotle Mexican Grill, Inc.*, 353 F. Supp. 3d 1070, 1087 (D. Colo. 2018) (holding in a DTSA case that payment card information is not a trade secret because the payment card information *must* be disclosed to other parties to make the information valuable; a trade secret cannot have value that is derivative of the thing it is trying to protect).

118.    Accordingly, Vita's concept is not entitled to trade secret protection, as Vita has not presented any evidence that there was value in the secrecy of its design.

### b. *Vita Has Not Established That its Alleged Trade Secrets Were Misappropriated*

119.    Even if the information Vita provided to Foro constituted a trade secret, Vita did not present evidence sufficient to establish that Foro misappropriated Vita's alleged trade secrets. Foro lawfully received Vita's alleged trade secrets, and the information that Foro received was never misappropriated.

120.    To succeed on a claim for trade secret misappropriation, the plaintiff must prove that a trade secret was either acquired by improper means or disclosed without the other

party's consent. *Tewari De-Ox Sys., Inc.*, 637 F.3d at 611 (citing *Hyde Corp. v. Huffines*, 314 S.W.2d 763, 769 (Tex. 1958)).[12]

121.    <u>First</u>, Vita's conceptual drawings and proposal were never sent to anyone outside of Foro. The conceptual drawings and proposal were never sent to Hytech Norway. It was not inappropriate for Foro to disclose those materials to Erik Skogen. *See Wright's Well Control Services, LLC v. Oceaneering Int'l, Inc.*, 292 F. Supp. 3d 735, 745 (E.D. La. 2018) (in a breach of NDA case, holding that "allegedly confidential information disclosed by [plaintiff] to [its] contractors and clients remains covered by the NDA," especially where there is an NDA in place that imposes a "duty of confidence"). Skogen was Foro's representative, had a Foro email address, was subject to an NDA, and was viewed as a Foro employee. Trial Tr. 21:18-22:2, Aug. 12, 2021 (Edwards); Trial Tr. 70:5-21, Aug. 12, 2021 (Marshall) 179:20-180:8, Aug. 12, 2021 (Marshall).[13]

122.    <u>Second</u>, no confidential information belonging to Vita was incorporated into the materials Foro provided to Hytech Norway. The Solidworks drawings Marshall sent to Hytech Norway were based on a 2013 Foro engineering design; the features were either established or already known by Foro. Trial Tr. 125:5-129:3, Aug. 12, 2021 (Marshall). This collection of information thus cannot be considered Vita's confidential or proprietary information.

---

[12] Vita has not alleged that Foro acquired the alleged trade secrets through improper means, so the only relevant inquiry for misappropriation is whether Foro breached the confidentiality provision of the NDA. *Educ. Mgmt. Services, LLC v. Tracey*, 102 F. Supp. 3d 906, 914 (W.D. Tex. 2015) (where plaintiff "admits that it willingly disclosed trade secrets" under confidentiality agreement, defendant's later alleged breach is "irrelevant to the method by which he obtained access to the trade secrets in the first instance").

[13] Even if it were inappropriate to disclose Vita's design to Skogen, there is no evidence that Skogen sent or disclosed the design to anyone else. Vita therefore cannot establish any harm from the disclosure.

123.     Vita has thus failed to present sufficient evidence to prove that Foro misappropriated any of Vita's alleged trade secrets.

### c. Vita Has Not Established Trade Secret Damages

124.     For the foregoing reasons, the Court concludes that Vita has failed to establish liability for trade secret misappropriation. Thus, Vita is not entitled to any damages as a matter of law.

### C. Vita Has Not Shown that Foro Breached the NDA

125.     Texas substantive law governs Vita's breach of contract claim.  PX001 § 18; Doc. 42 at 11. "In Texas, breach of contract requires four elements: (1) a valid contract, (2) plaintiff's performance, (3) defendant's breach, and (4) resulting damages." *Wease v. Ocwen Loan Servicing, LLC*, 915 F.3d 987, 993 (5th Cir. 2019); *Recif Res., LLC*, 2020 WL 6748049, at *4 (same).

### a. Foro Did Not Breach the NDA

126.     Vita claims that Foro breached the parties' NDA by sending certain aspects of Vita's allegedly confidential information to Hytech Norway. At trial, Vita newly claimed that Foro breached the NDA by sending Vita's conceptual drawings and its proposal to Foro's Norwegian consultant, Erik Skogen. Neither of these actions, however, constituted a breach of the parties' NDA.

### i. *The Information Vita Provided to Foro was Not Covered by the NDA*

127.     Because Vita's conceptual drawings and proposal were subject to the NDA's "Confidential Information and Material" exclusions, they were not covered by the NDA. Section 3 of the NDA expressly excludes certain categories of information from the scope of Confidential Information and Material. PX001 § 3. It excludes anything that "is now, or

hereafter becomes, through no act or failure to act on the part of the Receiving Party, [information] generally known or available to the public," *id.* § 3(a), and anything that "was known by the Receiving Party before receiving such information from the Disclosing Party." *Id.* § 3(b).

128.      The information Vita provided Foro was either "generally known or available to the public" or "information known by [Foro]" before it received the information from Vita. *See* PX001 § 3(a)-(b).

129.      <u>First</u>, Foro was familiar with the information contained in Vita's conceptual drawings and the proposal even before receiving it from Vita; Foro's own patent, published before it began working with Vita, depicted a "deployment wheel," "some hydraulic mechanisms capable of side-loading," and "an injector sheave with seven set of rollers." Trial Tr. 26:13-27:24, Aug. 11, 2021 (Deutch); DX026.

130.      Moreover, Marshall testified that he was already familiar with the information Vita provided. He had used a similar side-loading deployment mechanism prior to joining Vita. Trial Tr. 128:15-129:3, Aug. 12, 2021 (Marshall). And Marshall recognized the remaining features of Vita's conceptual design, such as the seven sets of rollers and 72-inch diameter, from a deployment mechanism that he had helped Foro procure in 2013. Trial Tr. 125:5-129:3, Aug. 12, 2021 (Marshall).

131.      The conceptual drawings did not contain any information not already in Foro's possession. Trial Tr. 96:11-19, Aug. 12, 2021 (Marshall); Trial Tr. 128:15-24, Aug. 12, 2021 (Marshall). Consequently, this information is not covered by the NDA, as it constitutes "information known by [Foro]" before it received the information from Vita. PX001 § 3(b).

132.     Second, Foro's patent was available to the public. As discussed above, several similar patents were also in the public domain before Vita provided Foro any information. DX010; DX012 (Vita expired patent depicting a CT unit); DX025 (Premier coil patent depicting hydraulically operation hold-down rollers). Vita's 1998 Patent also disclosed side-loading. DX012.008; *see supra* ¶¶ 54, 108-110.

133.     Foro was also aware of several commercially available alternatives, generally available to the public, that existed prior to Vita's conceptual design. *See* DX023 (powered sheave wheel with hold-down rollers and side-loading capability); DX022 (large-diameter coiled tubing injector with a hydraulic motor, planetary gear, and hold-down rollers); DX032 (powered sheave wheel for umbilical that is being driven hydraulically with a planetary gear and motor).

134.     These constitute "generally known or available to the public," PX001 § 3(a). Commercially available alternatives are accessible to anyone, and "a published patent application, like a patent, is readily available." *Wright's Well Control Services, LLC v. Oceaneering Int'l, Inc.*, 2015 WL 7281618, at *7 (E.D. La. Nov. 16, 2015). Because Vita's breach of contract claim is based on Foro's alleged use of this publicly available information, Vita's claim must fail. *Wright's Well Control Services*, 292 F. Supp. 3d at 745 (holding that defendant was not liable for breach of NDA where plaintiff's claim was based on "allegedly confidential information that [was] contained within [plaintiff's] patents").

*ii.   Communications with Skogen Are Not Evidence of Breach*

135.     Vita has not established that Foro unlawfully disclosed Vita's confidential information because Vita presented no evidence that Foro disclosed this information to a third party. Vita only presented evidence that Marshall sent Vita's conceptual drawings

and its proposal to Erik Skogen, a Foro representative with a Foro email address who serves as Foro's international program manager in Norway. Trial Tr. 179:20-24, Aug. 12, 2021 (Marshall).  Skogen is bound by an NDA and Foro's confidentiality agreements. Trial Tr. 257:2-258:1, Aug. 10, 2021 (Deutch).

136.     Between January 2015 and March 2015, Marshall sent Skogen the conceptual drawings Vita had provided to Foro, along with Vita's proposal, for reference as to the type of deployment mechanism Foro hoped to procure. Trial Tr. 71:1-5, Aug. 12, 2021 (Marshall); PX066; PX107. There is no record evidence that these materials were shared with anyone outside of Foro. Trial Tr. 70:22-25 and 178:15-179:17, Aug. 12, 2021 (Marshall).

### b. Vita Has Not Established Breach of Contract Damages

137.     For the foregoing reasons, Vita has failed to establish liability for breach of contract. Therefore, it is not entitled to any damages as a matter of law.

### D.  Neither Party is Entitled to Recovery of Attorneys' Fees

138.     The Parties agreed to submit evidence of recoverable attorneys' fees by submission to the Court, only if necessary. Trial Tr. 52:12-53:3, Aug. 12, 2021; *id.* at 188:2- 189:3. They need not do so.

139.     Because Vita has failed to prove Foro's liability for trade secret misappropriation or breach of contract, Vita is not entitled to attorneys' fees.

140.     Foro has also sought its reasonable attorneys' fees under 18 U.S.C. § 1836(b)(3)(D) and Section 134A.005(a) of the Texas Civil Practice and Remedies Code, alleging that Vita's claim of misappropriation was made in bad faith. Doc. 44 at ¶ 6. Courts have used a two-part test to analyze whether trade-secret claims have been brought

in such bad faith as to warrant attorneys' fees. They ask (1) whether the claims were entirely baseless or objectively specious and (2) whether the claims were made or pursued in subjective bad faith or for an improper purpose. *Source Prod. & Equip. Co. v. Schehr*, No. CV 16-17528, 2020 WL 4785048, at *4 (E.D. La. Aug. 18, 2020) (citing *Degussa Admixtures, Inc. v Burnett*, 277 F. App'x 530, 534 (6th Cir. 2008); *Stockade Cos. v. Kelly Restaurant Grp., LLC*, 2018 WL 3018177, at *6 & n.3 (W.D. Tex. June 15, 2018) (collecting cases)). The Court concludes (1) that Vita's misappropriation claim was neither entirely baseless nor objectively specious, and (2) that there is no evidence that Vita made or pursued its claims in subjective bad faith or for an improper purpose. Thus, the Court declines to exercise its discretion to award attorneys' fees to Foro under 18 U.S.C. § 1836(b)(3)(D) or Section 134A.005(a) of the Texas Civil Practice and Remedies Code.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on January 4, 2022.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE